**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**FRANCISCO JAVIER RODRIGUEZ,**

**Defendant.**

**3:13-CR-00094-BR**

**OPINION AND ORDER**

**S. AMANDA MARSHALL**
United States Attorney
**SCOTT M. KERIN**
**STACIE F. BECKERMAN**
Assistant United States Attorneys
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204
(503) 727-1000

Attorneys for Plaintiff

**AMY M. BAGGIO**
621 S.W. Morrison
Suite 1025
Portland, OR 97205
(503) 222-9830

Attorney for Defendant

**BROWN, Judge.**

This matter comes before the Court on Defendant's Motion (#22) to Suppress Evidence Obtained from Search Warrant. For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion. The Court also requires an additional evidentiary hearing in order to resolve the remaining issues as described herein.

## BACKGROUND

In March 2011 the government began investigating multiple targets in an operation deemed "Operation Aguagiestas" related to a drug-trafficking organization known as the Pulido Drug Trafficking Organization (Pulido DTO). In September 2012 the government sought and obtained judicial authorization for wiretaps from United States District Court Judges Marco A. Hernandez and Michael W. Mosman that authorized wiretapping and interception of telephone calls and text messages from various targets of the Pulido DTO investigation. In the course of federal investigators intercepting such calls and text messages, Defendant Francisco Javier Rodriguez came to the investigators' attention on September 26, 2012, when he made two telephone calls to Alejandro Torres-Oceguera (Torres), who was one of the primary subjects of the wiretaps.

On February 13, 2013, a grand jury indicted eight Pulido DTO

defendants, including Torres, with various drug-conspiracy charges in *United States v. Doe*, 3:13-CR-00059-MO. On February 14, 2013, the government obtained ten federal search warrants as part of its ongoing investigation. One of those warrants, authorized by Magistrate Judge Dennis James Hubel, permitted the search of Defendant's residence located at 13904 S.E. Woodward Street, Portland, Oregon. When they executed that search warrant on February 15, 2013, agents seized heroin, over 450 grams of marijuana, six small marijuana plants, handguns, ammunition, a scale with heroin residue, drug-packaging material, multiple cell phones, and $49,745 in cash.

On February 28, 2013, a grand jury indicted Defendant with one count of Conspiracy to Distribute and Possess with Intent to Distribute Heroin in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; one count of Possession with the Intent to Distribute Heroin in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); one count of Possession with the Intent to Distribute Marijuana in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 841(b)(1)(D), and 846; and criminal forfeiture.

On September 6, 2013, Defendant filed his Motion to Suppress Evidence Obtained from Search Warrant.

On October 28, 2013, the Court conducted a hearing on Defendant's Motion. At the hearing the parties agreed the only evidence on which they intended to rely was the Affidavit of Special Agent Carrie Hutchison filed in support of the February 2013 search-warrant application. Shortly after the hearing the Court requested the parties to file supplemental briefs no later than November 4, 2013, to address whether Hutchison's Affidavit provided probable cause to authorize a search for firearms in Defendant's residence. The Court took this matter under advisement on November 4, 2013.

## DISCUSSION

Defendant moves to suppress all of the evidence obtained from the February 15, 2013, search of his residence on the grounds that the February 14, 2013, warrant that authorized the search was not supported by probable cause particular to him and there is not any applicable good-faith exception as set out in *United States v. Leon*, 468 U.S. 897 (1984), on which the searching officers may have relied under the circumstances of this case.

### I. Probable cause to support a search-warrant standard

The Warrant Clause of the Fourth Amendment requires

> compliance with two related but distinct rules. First, [a search warrant] must describe the place to be searched or things to be seized with

> sufficient particularity, taking account of the circumstances of the case and the types of items involved. Second, it must be no broader than the probable cause on which it is based.

*United States v. Gourde*, 382 F.3d, 1003, 1008 (9th Cir. 2004). *Id.* (internal citations omitted).

The role of a judge in reviewing a search-warrant application is to determine whether, "'given all the circumstances set forth in the affidavit, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1263 (9th Cir. 2012)(quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "'A magistrate judge's finding of probable cause is entitled to great deference.'" *United States v. Rios*, 434 F. App'x 648, 650 (9th Cir. 2011)(quoting *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007)). A court "will not find a search warrant invalid if the magistrate judge had a substantial basis for concluding that the supporting affidavit established probable cause.'" In contrast, "[a] reviewing court should find that probable cause is not met when the issuing judge lacked a 'substantial basis [to] . . . conclude' that probable cause existed." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2012)(quoting *Gates*, 462 U.S. at 238-39).

The Ninth Circuit explained in *Underwood*:

> Conclusions of the affiant unsupported by

> underlying facts cannot be used to establish probable cause. *See United States v. Cervantes*, 703 F.3d 1135, 1139–40 (9th Cir. 2012)(affording little if any weight to detective's conclusory statement that, based on his training and experience, the box in defendant's possession came from a suspected narcotics stash house). . . . An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination.

*Id*. (citations omitted).

## II. The search-warrant application

As noted, Defendant contends the February 14, 2013, search warrant was not supported by probable cause particular to him. Defendant emphasizes the warrant application reflected as to Defendant only two telephone calls on September 26, 2012, five months before the warrant application; geolocation and surveillance data from the same date; an October 2012 claim by an unreliable and uncorroborated informant who said Defendant was a heroin dealer; and the opinion of the agent who sought the warrant regarding general practices of drug traffickers.

Specifically, the Affidavit of Special Agent Carrie Hutchison supporting the warrant notes the following with respect to Defendant:

> **Subject Location-WOODWARD**: **13904 SE Woodward Street, Portland, Oregon** (hereinafter referred to as the **Subject Location-WOODWARD**), is a single family residential property, utilized by Francisco Javier Rodriguez (hereinafter referred to as RODRIGUEZ), who is a drug distributor for the

PULIDO DTO. Power subscriber is listed as Francisco RODRIGUEZ. Subscriber information for phone number 971-227-5814, is listed as Francisco RODRIGUEZ at **Subject Location-WOODWARD**. This phone number was intercepted over TT4, engaging in pertinent drug related conversation.

* * *

**Francisco RODRIGUEZ**, is a Hispanic male, DOB XXIXX/1989, FBI number 336749VC3, believed to reside at 13904 SE Woodward Street, Portland, OR (**Subject Location-WOODWARD**). Criminal history records indicate RODRIGUEZ has been convicted of a misdemeanor for ORS 811.540 Attempt Elude Police Officer-Vehicle on June 16,2008. RODRIGUEZ is believed to be a Retail Dealer for the PULIDO DTO, intercepted during T-III operations, engaged in pertinent drug related conversation.

* * *

During the course of this investigation, investigators have established **Subject Location-WOODWARD** as Francisco Javier RODRIGUEZ's primary residence through surveillance, power subscriber and T-III intercepts as further described herein. While residing at **Subject Location-WOODWARD**, TORRES delivered narcotics to and collected drug proceeds from RODRIGUEZ. The following surveillance/T-III intercepts are a sampling from the investigation revealing RODRIGUEZ historical use of **Subject Location-WOODWARD** to further the drug conspiracy in violation of Title 21 USC 846.

On, September 26, 2012, at approximately 1226 hours, investigators monitoring TT1- TORRES received an incoming call from phone number 971-227-5814, subscribed to Francisco RODRIGUEZ at **Subject Location-WOODWARD** (Session #289). During the conversation, RODRIGUEZ stated that he needed "something" for today or tomorrow. TORRES asked RODRIGUEZ if RODRIGUEZ wanted the "same," which RODRIGUEZ confirmed. At approximately 2213 hours, investigators monitoring TT1-TORRES, intercepted a call between RODRIGUEZ and TORRES. During the conversation, RODRIGUEZ asked if TORRES would come

> by "today" or '"tomorrow." TORRES replied, "I'll come over right now."
>
> On September 26, 2012, at approximately 2308 hours, geo-location data on TT1-TORRES showed TORRES in the area of Subject Location-WOODWARD. At approximately 2115 hours, Homeland Security Investigations (HSI) Special Agent Burke observed a 2004 Acura TSX bearing Oregon License Plate 490FBF, registered to RODRIGUEZ at **Subject Location-WOODWARD**, parked in the driveway at **Subject Location-WOODWARD.**
>
> In October 2012, a Confidential Source (CS) utilized by DEA Task Force Officer Roelof, identified RODRIGUEZ by his Oregon Driver's License photograph as a heroin dealer in Portland, OR.
>
> * * *
>
> On February 2, 2013, surveillance personnel observed a black BMW bearing Oregon License plate 416FPM, registered to RODRIGUEZ at **Subject Location-WOODWARD.**
>
> On February 5, 2013, surveillance personnel observed RODRIGUEZ at the **Subject Location-WOODWARD.**
>
> Based upon the investigation to date, my training and experience and wire intercepts, I believe that TORRES delivered an unknown amount of drugs to RODRIGUEZ at the **Subject Location-WOODWARD** and that RODRIGUEZ is a retail dealer and facilitator for the PULIDO DTO and that evidence of a drug conspiracy will be located at **Subject Location-WOODWARD.**

Aff. of Carrie Hutchison at ¶¶ 2(g), 17, 99-102, 104-06.

## III. Probable-cause analysis

Defendant relies primarily on *United States v. Underwood* and *United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993), to support

his position that the February 14, 2013, search warrant was not supported by probable cause as to him.

In *Underwood* the Drug Enforcement Administration (DEA) and the Beverly Hills Police Department conducted a wiretap investigation into a suspected drug-trafficking organization headed by Underwood's co-defendant, Jimmy Luong (Luong DTO). In April 2010 agents followed Luong and Tony Barrera, another one of Underwood's co-defendants, from Barrera's residence to a Home Depot parking lot where agents observed Luong and Barrera meeting with Underwood and transferring two large unmarked crates from Underwood's vehicle to their own. Agents used surveillance to track the two crates to a Luong DTO stash house where the crates were subsequently seized and found to contain thousands of ecstasy pills. 725 F.3d at 1078. On July 22, 2010, federal agents, assisted by local law enforcement including Los Angeles Police Department Detective James Kaiser, simultaneously executed search warrants for fifteen residences, stash houses, and vehicles. DEA Agent Peter Johnson prepared the 102–page affidavit in support of the federal search warrants. Underwood did not challenge the federal search warrant. *Id*. One of the federal warrants was executed at a house on Cantrece Lane in Cerritos, California, that was believed to be Underwood's home. Officers found only Underwood's mother, who told them that Underwood actually lived on Mansa Drive in La Mirada, California.

*Id*. at 1079. A search of the Cantrece Lane house did not reveal any evidence of drug trafficking. Agents arrested Underwood later on July 22, 2010, at the Mansa Drive house and conducted a protective sweep of the house. During that sweep agents observed a clear zip-lock bag containing a personal-use amount of marijuana on a table in the living room. *Id*. Underwood refused to give consent to a full search of the house. DEA Agent Johnson, therefore, instructed local officers to obtain a state search warrant for the Mansa Drive house as soon as possible. LAPD Detective Kaiser was assigned the task of securing the warrant. To assist Kaiser with the task, Johnson emailed Kaiser a summary of the case against Underwood based on the federal affidavit and an explanation of why Johnson believed evidence would be found at the Mansa Drive house. Kaiser cut and pasted some, but not all, of the information in the federal warrant into an affidavit supporting the state warrant. *Id*. As a result, the state affidavit did not include any factual details of “other seizures” to support Kaiser's stated belief that the crates contained 260,000 pills of ecstasy. The agents’ observation of Underwood delivering two wooden crates to Luong and Barrera was the only factual support for the conclusion that Underwood was a “courier” for the Luong DTO. Based on Kaiser's affidavit, a Los Angeles Superior Court judge issued a search warrant for the Mansa Drive house on July 22, 2010. The judge did not ask to

review the federal affidavit referenced in Kaiser's state affidavit. The search pursuant to the state warrant resulted in the seizure of thirty-three kilograms of cocaine, $417,000 in cash, 104 ecstasy pills, packaging material, a money counter, and a “pay/owe” sheet. *Id*. at 1080.

Underwood moved to suppress the evidence seized in the search of the Mansa Drive house on the grounds that the affidavit supporting the state search warrant for Mansa Drive lacked probable cause and the good-faith exception to the exclusionary rule established in *Leon* did not apply because the affidavit was a “bare bones” affidavit that lacked indicia of probable cause.

The district court granted the motion to suppress because the affidavit supporting the state search warrant merely set forth conclusory allegations and only contained two facts: Underwood's delivery of undescribed crates to Luong three months before the warrant application and the observation of a personal-use amount of marijuana in Underwood's home. The district court further concluded the good-faith exception did not apply because the affidavit did not make a colorable showing of probable cause and, therefore, was a “bare bones” affidavit. The government appealed.

The Ninth Circuit affirmed the district court and concluded: "When viewed in the totality of the circumstances, the affidavit here fails to provide a sufficient basis for probable cause."

*Id*. at 1082. The court noted:

> First, the affidavit describes Detective Davis's observation of a baggie of a personal-use amount of marijuana at Underwood's Mansa Drive home during the protective sweep. Although this description is a sufficiently detailed factual allegation, it lacks a nexus with ecstasy trafficking and therefore does not support the conclusion that Underwood is a ecstasy trafficker . . . . [T]he personal-use amount of marijuana observed in Underwood's home fails to support the conclusion that Underwood is a courier for an ecstasy trafficking organization or that evidence of such trafficking would be found at Underwood's home.
>
> Second, the fact that agents observed Underwood deliver two wooden crates to Luong and Barrera on one occasion three months before the warrant application hardly supports the conclusion that Underwood is a drug courier working for Luong. The affidavit does not make any other factual assertions indicating that Underwood made other deliveries to Luong or Barrera or even had contact with Luong or Barrera at any other time. Moreover, the affidavit neither includes a description of the crates, nor any other facts that would indicate that the crates contained ecstasy. We afford little to no weight to the statement, "Based on other seizures in this investigation, I believe the crates contained approximately 260,000 pills of MDMA." This statement adds the general fact that the investigation resulted in seizures. Unlike in the federal affidavit, however, the statement is not accompanied by an explanation of the nature of the seizures—for example, what was seized and where the seizures took place. This statement is thus a bare conclusion because it provides no underlying facts about the seizures from which the issuing judge could draw his or her own conclusion about how, if at all, the seizures indicate that the two crates contained ecstasy.
>
> Third, the affidavit contained Johnson's beliefs about drug traffickers' general habits based on Johnson's experience and training, including that

> drug traffickers often keep records from drug transactions at their residences. . . . [T]he affidavit[, however,] not only fails to define "drug trafficker" but it also provides no facts to support the conclusion that Underwood is in the business of buying and selling ecstasy. Moreover, the affidavit does not even assert that Underwood is a drug trafficker.
>
> * * *
>
> Detective Kaiser's statement that a federal warrant had previously issued in the case for a different residence does not add any indicia of probable cause to the state affidavit. First, neither the federal warrant nor the 102–page federal affidavit were attached to the state affidavit. In this situation, the mere assertion of the prior issuance of the federal warrant for a different property should not be treated as a "supporting fact or circumstance" for probable cause purposes.

*Id*. at 1082-84.

*Underwood*, however, is distinguishable from this case. As the Court noted at the October 28, 2013, hearing in this matter, Hutchison's Affidavit is sufficient to establish there was a fair probability in September 2012 that (1) there was a drug-trafficking organization then operating in Portland, Oregon; (2) Torres was a drug supplier within that organization; (3) the telephone conversations on September 26, 2012, between Defendant and Torres involved an order for controlled substances; (4) the use of the words "the same" in the first conversation indicates that on at least one prior occasion Defendant and Torres had engaged in a similar drug transaction; and (5) the convergence of Torres and Defendant in the vicinity of Defendant's house after

the conversations indicates there was likely a transfer of controlled substances between them on that date.

Thus, Agent Hutchison's Affidavit provides significantly more factual support for the probability that Defendant was involved in the Pulido DTO as of September 2012 than the scant factual record provided in the affidavit to support the search warrant in *Underwood.* Nevertheless, Defendant emphasizes, and the Court agrees, there are not any facts set out in Hutchison's Affidavit that establish Defendant continued to interact with Torres or the drug-trafficking organization after September 2012.[1]

In response, the government points to Paragraph 116 in the Affidavit in which Agent Hutchinson testifies that drug traffickers often retain at their residences a laundry list of items such as currency, records, money-counting machines, cellular telephones, firearms, and goods used in the manufacture of controlled substances. Although the government contends this assertion is enough to support a conclusion that there was a fair probability in February 2013 that all of these kinds of items would then be found in Defendant's residence, the government does not offer any case precedent nor has the Court found any

[1] Because the October 2012 statement of the confidential informant lacks indicia of reliability and is uncorroborated, it does not provide any support for a probable-cause determination in February 2013.

authority to support the breadth of that proposition.

Nevertheless, although it is a close question, this Court, after considering the totality of the circumstances and giving "great deference" to the Magistrate Judge's finding of probable cause, finds the facts that support the conclusion that Defendant was trafficking in drugs in September 2012 also support a reasonable inference that there was a fair probability in February 2013 that certain items associated with drug trafficking like currency, (transaction) records, money-counting machines, and cellular telephones would then be found in Defendant's residence. That inference is reasonable because currency from drug transactions is not perishable and not necessarily likely to be used up within five months; records of drug transactions on cellular telephones or in other formats can be useful and, therefore, retained for unpredictable periods; and the five-month gap between the drug-transaction calls in September 2012 and the warrant application in February 2013 does not reduce the "fair probability" that drug-trafficking items like these would still be present.

Accordingly, the Court concludes there was probable cause in February 2013 to issue the warrant to search Defendant's residence for this type of evidence relating to illegal drug trafficking.

On the other hand, and particularly in light of the five-

month lapse between the intercepted telephone calls in September 2012 and the warrant application in February 2013, the Court concludes Agent Hutchison's Affidavit does not provide any factual basis from which to conclude there was a fair probability in February 2013 that controlled substances or firearms would be found at Defendant's residence. As noted, there is not any factual basis to conclude Defendant was still active in drug transactions, and Hutchison's Affidavit does not contain any facts that suggest Defendant owned, had access to, or used firearms. Agent Hutchison's general assertion that drug traffickers "commonly have firearms in their possession" is insufficient to create a fair probability that Defendant would still have any firearms at his residence in February 2013 even if he had them at the time that he was conducting a drug transaction with Torres in September 2012.

On this record the Court concludes Hutchison's Affidavit did not provide a factual basis to find probable cause to issue the warrant with respect to controlled substances and/or firearms.[2]

**IV. The good-faith exception**

---

[2] The Court notes the Hutchinson Affidavit is 49 pages long and contains information relating to ten residences and ten targets of the investigation. It does not appear the Affiant made any effort to highlight or to individualize for the Magistrate Judge the probable-cause analysis applicable to Defendant in contrast with the overwhelming evidence supporting the issuance of search warrants for the residences of the others who were the subject of the Affidavit.

"If a warrant lacks probable cause, evidence obtained during its execution should generally be suppressed under the exclusionary rule." *Underwood*, 725 F.3d at 1084 (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).

> [S]ignificant exceptions to the [exclusionary] rule have developed. Under these exceptions, evidence seized pursuant to a defective warrant will not be suppressed. One such exception is the "good faith" exception established by *Leon*, which is satisfied if an officer acts "in objectively reasonable reliance" on the warrant. 468 U.S. at 922, 104 S. Ct. 3405. To determine whether the officer acted in objectively reasonable reliance, "all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered." *Id.* at 922 n.23; *see also Messerschmidt v. Millender*, --- U.S. ----, 132 S. Ct. 1235, 1249–50 (2012) (where the Supreme Court considered whether an officer had a superior review the challenged affidavit to determine if the officer acted in reasonable reliance, thus clarifying that courts can look beyond the four corners of the affidavit to consider extrinsic factors in the good faith analysis). The burden of demonstrating good faith rests with the government. *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995).

*Id*.

In *Leon* the Court concluded an "officer will have no reasonable grounds for believing that the warrant was properly issued" when, among other things, the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 922.

"An affidavit is so lacking in indicia of probable cause, or

bare bones, when it fails to provide a colorable argument for probable cause." *Underwood*, 725 at 1086 (citing *United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988). "A colorable argument is made when 'thoughtful and competent judges' could disagree that probable cause does not exist." *Id*. (quoting *Hove*, 848 F.2d at 139).

Defendant relies on *Underwood* to support his assertion that the good-faith exception does not apply to Hutchison's Affidavit. In *Underwood* the Ninth Circuit concluded the affidavit supporting the state warrant was not entitled to the good-faith exception because

> the affidavit fails to set forth a sufficient factual basis for the conclusion that Underwood is a courier for an ecstasy trafficking organization. The only fact with any degree of support for this conclusion is the observation that, three months before the warrant application for Mansa Drive, Underwood delivered two wooden crates to Luong and Barrera in a Home Depot parking lot. There are no accompanying facts in the affidavit to support the inferences that the crates contained ecstasy or that Underwood knew or should have known the crates contained ecstasy. Kaiser advanced DEA Agent Johnson's belief that the crates contained ecstasy, but did not provide underlying facts that could be used to judge the reasonableness of Johnson's belief.
>
> Moreover, the affidavit provides no factual basis for the conclusion that drug trafficking evidence would be found at Underwood's home. . . . [E]xpert opinion about drug traffickers keeping evidence of their crimes at their homes is foundationless because the affidavit did not assert that Underwood was a drug trafficker, and thus cannot be used to support probable cause. Further, even if we make the unreasonable

> inferences that the crates contained drugs and that Underwood knew the crates contained drugs, Underwood delivered those crates to Luong and Barrera, who took them away from him. We thus cannot conclude that any drugs contained in those crates were in Underwood's possession, let alone at Underwood's house in particular. The affidavit does not assert that any other deliveries by Underwood to anyone else ever took place. Thus, it would also be unreasonable to conclude that Underwood ever possessed any other crates, let alone that such crates would be at Underwood's house.

*Id*. at 1086. The court concluded the affidavit reasonably supported three "innocent" conclusions: "Underwood knows Luong and Barrera; he helped Luong and Barrera move two crates on one occasion; and Underwood possibly uses marijuana." *Id*. The court found "[r]easonable judges would agree that probable cause did not exist to search Underwood's Mansa Drive house because the affidavit provides only the most attenuated support for the conclusion that Underwood is a drug courier and no support for the conclusion that drug trafficking evidence would be found at Mansa Drive." *Id*.

As already noted, however, Hutchison's Affidavit in this case reasonably supported the conclusions that as of September 2012 (1) Defendant had at least two interactions with Torres that likely involved the sale or transfer of narcotics; (2) Torres was familiar enough with Defendant not to require Defendant to set out a specific quantity, price, or delivery terms; and (3) Torres knew the location of Defendant's residence, all of which suggests

a then-existing, ongoing relationship between Defendant and Torres related to illegal substances. Hutchison's Affidavit also sets out the suspected details of the Pulido DTO and Torres's relatively high-level status therein as well as Torres's suspected narcotics-trafficking activities. Accordingly, even if the Court is incorrect in concluding there was probable cause to support a warrant to search for items like currency, (transaction) records, money-counting machines, and cellular telephones, the Court also concludes on this record that Hutchison's Affidavit was not so lacking in indicia of probable cause as to render official belief in the existence of probable cause to search for these items at Defendant's residence entirely unreasonable. Thus, the good-faith exception to the warrant requirement applies to the search for these items.

The same cannot be said, however, about applying the good-faith exception to that part of the warrant authorizing a search for illegal drugs and/or firearms at Defendant's residence. As noted, there are not any specific facts in Hutchison's Affidavit connecting Defendant to still-active drug transactions or to any ongoing illegal possession or use of firearms. Specifically, Hutchison's general assertion that drug traffickers commonly have firearms in their possession is insufficient to create a colorable argument that firearms would be found at Defendant's residence in February 2013.

**V. Plain view**

The government also argues Defendant's Motion should be denied to the extent that contraband or evidence was in "plain view" when the warrant was lawfully executed. The Ninth Circuit has held officers may seize evidence in plain view when two requirements are met: "[T]he officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent." *United States v. Lemus*, 582 F.3d 958, 964 (9th Cir. 2008)(quotation omitted).

The government asserts in its Supplemental Response that even if there was not probable cause in the Affidavit to search Defendant's residence for firearms,[3] to the extent that the officers were justified in entering Defendant's residence to search for drug-related evidence, they were lawfully permitted to seize firearms in plain view. The government, however, did not present any evidence at the October 28, 2013, hearing related to the firearms (and illegal drugs) discovered at Defendant's residence and, therefore, did not establish how the firearms and illegal drugs were discovered. Thus, the record before the Court does not contain any evidence related to the issue of "plain view," and, accordingly, the Court concludes a second hearing is necessary to receive evidence related to the search of

[3] The Court assumes the government would make the same contingent argument as to illegal drugs in light of the Court's analysis herein.

Defendant's residence, specifically addressing whether firearms, illegal drugs, or other seized evidence not already permitted by the Court's analysis herein was, nevertheless, found in plain view.

## CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion (#22) to Suppress Evidence Obtained from Search Warrant as follows:

1. The Court concludes there was probable cause to issue the warrant to search Defendant's residence for evidence of certain non-perishable items commonly associated with drug trafficking such as currency, records, money-counting machines, and cellular telephones. Even if there was not probable cause to search for these items, the Court also concludes the good-faith exception applies to the portion of the warrant authorizing the search for the above items. The Court, therefore, **DENIES** Defendant's Motion as to that evidence.
2. The Court concludes there was not probable cause to issue the warrant to search Defendant's residence for controlled substances or firearms and the good-faith exception does not apply to the portion of the warrant authorizing a search for illegal drugs or firearms.

The Court, therefore, **GRANTS** Defendant's Motion as to that evidence.

The Court will issue a separate Order setting the time for a second evidentiary hearing in this matter to receive evidence addressing whether firearms, illegal drugs, or other evidence was found in plain view during the February 2013 search of Defendant's residence.

IT IS SO ORDERED.

DATED this 26th day of November, 2013.

/s/ Anna J. Brown

ANNA J. BROWN
United States District Judge